IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>AVANIR PHARMACEUTICALS, INC. | Criminal Action No.<br><br>1:19-CR-00369 |

**Deferred Prosecution Agreement**

The United States of America, by Byung J. Pak, United States Attorney for the Northern District of Georgia (the "Government") and Defendant Avanir Pharmaceuticals, Inc. (the "Company"), pursuant to authority granted by the Company's Board of Directors (reflected in Attachment B), enter into this deferred prosecution agreement (the "Agreement").

**Criminal Information and Acceptance of Responsibility**

1.   The Company consents to the filing by the Government of the attached one-count criminal Information in the United States District Court for the Northern District of Georgia charging the Company with a violation of the Anti-Kickback Statute, in violation of 42 U.S.C. § 1320a–7b(b)(2)(B).  In so doing, the Company: (a) knowingly waives its right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States

1

Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A.  The Government agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.   The Company admits that it is responsible under United States law for the acts of its officers, directors, and employees as set forth in the attached Statement of Facts, and that the facts described in the attached Statement of Facts are true and accurate.  Should the Government pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the attached Statement of Facts in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

## Term of the Agreement

3.   This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term").  The Company agrees, however, that, in the event the Government determines, in its

sole discretion, that the Company has knowingly and materially violated any provision of this Agreement or has materially failed to perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Government, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Government's right to proceed as provided in Paragraphs 15-18 below.  Any extension of the Agreement extends all terms of this Agreement, for an equivalent period. Conversely, in the event the Government finds, in its sole discretion, that the provisions of this Agreement have been satisfied, the Agreement may be terminated early.  If the Court declines to defer prosecution as contemplated by Paragraph 11, all the provisions of the Agreement shall be deemed null and void and the Term shall be deemed to have not begun.

4.  The Government enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.  the Company's acknowledgement of its conduct and acceptance of responsibility for that conduct;

b.  the Company received full credit for its cooperation with the Government's investigation, including: conducting a thorough internal investigation, making regular factual presentations to the Government, collecting

and producing employee cell phone records and text messages, and collecting, analyzing, and organizing voluminous evidence and information;

      c.  the Company provided to the Government all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed to the Government prior to the Agreement;

      d.  the Company engaged in extensive remedial measures, including terminating, or permitting to resign in lieu of termination, multiple employees, at various levels of the organization, including senior executives;

      e.  the Company has enhanced its compliance program and internal controls, and has committed to ensuring that its compliance program satisfies the minimum elements set forth in the Corporate Integrity Agreement separately agreed to by the Company and the Office of Inspector General of the United States Department of Health and Human Services;

      f.  based on the Company's remediation and the state of its compliance program and the Company entering a Corporate Integrity Agreement with the Department of Health and Human Services Office of Inspector General, the Government determined that an independent compliance monitor was unnecessary;

g.   the nature and seriousness of the offense conduct, including the seniority of culpable employees, the breadth of the conduct, and the effectiveness of the use of illegal remuneration;

h.   the Company has no prior criminal history; and

i.   the Company has agreed to continue to cooperate with the Government, including other United States Attorney's Offices, in any ongoing investigation of the conduct of the Company and its officers, directors, employees, agents, business partners, distributors, and consultants pursuant to the terms of Paragraph 5.

5.   The Company shall cooperate fully with the Government in any and all matters relating to the conduct:  (1) covered by this Agreement, the Information, and the attached Statement of Facts; (2) that was the subject of the subpoena to the Company dated February 19, 2016, and the related criminal investigation and civil investigation by components of the United States Department of Justice, including the Northern District of Georgia and the Northern District of Ohio; or (3) currently known to the United States regarding sales, promotion, and marketing practices in connection with its drug Nuedexta until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term specified in Paragraph 3.  At the request of

5

the Government, the Company shall also cooperate fully, at any time during the Term, with other domestic enforcement and regulatory authorities and agencies in any investigation of the Company or its subsidiaries, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct:  (1) covered by this Agreement, the Information, and the attached Statement of Facts; (2) that was the subject of the subpoena to the Company dated February 19, 2016, and the related criminal investigation and civil investigation by components of the United States Department of Justice, including the Northern District Georgia and the Northern District of Ohio; or (3) currently known to the United States regarding the Company's sales, promotion, and marketing practices in connection with the drug Nuedexta.  The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as any applicable privilege or protection.  The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

a.  The Company shall truthfully disclose all factual information with respect to its activities, those of any subsidiaries, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations about which the

6

Company has any knowledge and about which the Government may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Government, upon request, any document, record or other tangible evidence about which the Government may inquire of the Company and which is not subject to any applicable privilege or protection.

b.  Upon request of the Government, to the extent reasonably possible the Company shall designate knowledgeable employees, agents or attorneys to provide to the Government the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information to the best of its current knowledge, information, and belief.

c.  The Company shall use its good faith efforts to make available for interviews or testimony, as requested by the Government, present or former officers, directors, employees, agents and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before federal grand juries or in federal trials, as well as interviews with domestic law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include

identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.  With respect to any information, testimony, documents, records or other tangible evidence provided to the Government pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities of such materials that the Government, in its sole discretion, shall deem appropriate.

e.  The cooperation provisions in this Agreement shall no longer apply in the event that the Government pursues a criminal prosecution against the Company related to the charge in the Information.

6.      In addition to the obligations in Paragraph 5, if during the Term the Company determines, following a reasonable opportunity to conduct an appropriate review or investigation, any probable felony violation by the Company of the laws enumerated in Paragraph 10, the Company shall promptly report such evidence or allegation to the Government.

### Payment of Monetary Penalty and Forfeiture

7.      The Company agrees to pay a total of $12,874,895 no later than seven business days after (i) the Agreement is fully executed or (ii) the Court agrees to defer prosecution pursuant to the terms of this Agreement, whichever

8

occurs later.  Payment shall be made pursuant to payment instructions provided by the Government in its sole discretion, which may direct that the payment be made in two or more transactions, to two or more payers.  That includes a monetary penalty in the amount of $7,800,000 and forfeiture in the amount of $5,074,895.  In light of the Civil Settlement Agreement, no additional restitution shall be paid by the Company, unless the Company breaches either this Agreement or the Civil Settlement Agreement.  The Company and the Government agree that the monetary penalty is appropriate given the facts and circumstances of this case, including: the nature and extent of Company's cooperation, extensive remediation in this matter, and the enhanced compliance program the company has instituted.  The $7,800,000 penalty is final and shall not be refunded, except as set forth in Paragraph 3 related to the rejection of deferral of prosecution by the Court.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that $7,800,000 is the maximum penalty that may be imposed in any future prosecution that may be brought if the Court rejects the deferral of prosecution as set forth in Paragraph 3 or the Company breaches the Agreement, and the Government is not precluded from arguing in any future such prosecution that the Court should impose a higher fine, although the Government agrees that under those circumstances, it

9

will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this $7,800,000 penalty. The Company agrees that it has no right to and shall not seek or accept from any source reimbursement or insurance coverage for any federal healthcare program claims underlying the penalty and forfeiture amounts that the Company pays pursuant to this Agreement.

8.    As a result of the Company's conduct, including the conduct set forth in the attached Statement of Facts, the parties agree the Government could institute a civil and/or criminal forfeiture action against certain funds held by the Company and that such funds would be forfeitable pursuant to 18 U.S.C. §§ 982(a)(7) and 981(a)(1)(C) and 28 U.S.C. § 2461(c). The Company hereby acknowledges that at least $5,074,895 constitutes proceeds of the offense described in the Information. The Company hereby agrees to forfeit to the United States the sum of $5,074,895 (the "Forfeiture Amount"). The Company hereby agrees that, in the event the funds used to pay the Forfeiture Amount are not directly traceable to the transactions, the monies used to pay the Forfeiture Amount shall be considered substitute *res* for the purpose of forfeiture to the

United States pursuant to 21 U.S.C. § 853(p), 18 U.S.C. § 982(b), and 28 U.S.C. § 2461(c), and the Company releases any and all claims it may have to such funds. The Company agrees to sign any additional documents necessary to complete forfeiture of the funds.

9. The Forfeiture Amount paid is final, except as set forth in Paragraph 3 related to the rejection of deferral of prosecution by the Court, and shall not be refunded should the Government later determine that the Company has breached this Agreement and commences a prosecution against the Company. In the event of a breach of this Agreement and subsequent prosecution, the Government may pursue additional civil and criminal forfeiture in excess of the Forfeiture Amount. The Government agrees that in the event of a subsequent breach and prosecution for the reasons set forth in this paragraph, it will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever forfeiture the Court shall impose as part of its judgment. The Company understands that such a recommendation will not be binding on the Court.

## Corporate Compliance Program

10. The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect

11

violations of Food, Drug, and Cosmetics Act, 21 U.S.C. § 301 et seq., the Anti-

Kickback Statute, 42 U.S.C. § 1320a-7b, HIPPA, 42 U.S.C. § 1320d-6, healthcare

fraud, 18 U.S.C. § 1347, false claims, 18 U.S.C. §§ 286 & 287, conspiracy to

defraud the United States, 18 U.S.C. § 371, obstruction of justice, 18 U.S.C.

§§ 1505 & 1510, and false statements, 18 U.S.C. § 1001, throughout its operations,

including those of its subsidiaries, operationally controlled affiliates, agents, and

joint ventures.  The Company also agrees to abide by the terms of the Corporate

Integrity Agreement entered into separately between the Company and the

Department of Health and Human Services Office of Inspector General.

## **Deferred Prosecution**

11.     Subject to Paragraphs 15-18, in consideration of the undertakings

agreed to by the Company herein, the Government agrees that it will

recommend to the Court that any prosecution of the Company on the

Information be deferred for the Term and that, except as provided in this

Agreement, it shall not seek to prosecute or bring any criminal case against the

Company, its subsidiaries, operationally controlled affiliates, successors, or

assigns for any act within the scope of, or relating to: (1) the conduct covered by

this Agreement, the Information, and the attached Statement of Facts; (2) the

conduct that was the subject of the subpoena to the Company dated February 19,

2016, and the related criminal investigation and civil investigation by

components of the United States Department of Justice, including the Northern

District of Georgia and Northern District of Ohio; or (3) facts currently known to

the Government regarding sales, promotion, and marketing practices in

connection with its drug Nuedexta at the time of entry of this Agreement.

12.     It is understood that this Agreement does not relate to or cover any

conduct by the Company other than as set forth in Paragraph 11.  In addition, it

is understood that this Agreement does not provide any protection against

prosecution of any individuals, regardless of their affiliation with the Company.

It is also understood that this Agreement does not provide any protection against

prosecution for any future conduct by the Company.

13.     The Government further agrees that if the Company fully complies

with all of its obligations under this Agreement, pursuant to the terms of

Paragraph 11, the Government will not continue the criminal prosecution against

the Company described in Paragraph 1 and as described in the Statement of

Facts, and at the conclusion of the Term, this Agreement shall expire.  Within 60

days after the Agreement's expiration, the Government shall seek dismissal with

prejudice of the criminal Information filed against the Company described in

Paragraph 1, and the Government agrees not to file charges in the future against

the Company relating to: (1) the conduct covered by this Agreement, the Information, and the attached Statement of Facts; (2) the conduct that was the subject of the subpoena to the Company dated February 19, 2016, and the related criminal investigation and civil investigation by components of the United States Department of Justice, including the Northern District of Georgia and Northern District of Ohio; or (3) facts currently known to the Government regarding sales, promotion, and marketing practices in connection with its drug Nuedexta at the time of entry of this Agreement.

14.     So long as the Company has not breached the Agreement, the Government will not use, in any criminal or civil case against the Company, any self-incriminating information provided by the Company pursuant to its cooperation that was not previously known to the Government except in (a) a prosecution for perjury or obstruction of justice; (b) a prosecution for making a false statement; (c) a prosecution or other proceeding relating to any crime of violence; or (d) a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

### Breach of the Agreement

15.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately

14

false, incomplete, or misleading information, including in connection with its

disclosure of information about individual culpability; (c) fails to cooperate as set

forth in Paragraph 5 of this Agreement; (d) fails to implement a compliance

program as set forth in Paragraph 10 of this Agreement and the Corporate

Integrity Agreement entered into separately between the Company and the

Department of Health and Human Services Office of Inspector General; or

(f) otherwise fails to completely perform or fulfill each of the Company's

obligations under the Agreement regardless of whether the Government

becomes aware of such a breach after the Term is complete, the Company shall

thereafter be subject to prosecution for any federal criminal violation of which

the Government has knowledge, including, but not limited to, the charges in the

Information described in Paragraph 1, which may be pursued by the

Government in the U.S. District Court for the Northern District of Georgia or any

other appropriate venue.  Determination of whether the Company has breached

the Agreement and whether to pursue prosecution of the Company shall be in

the Government's sole discretion.  Any such prosecution may be premised on

information provided by the Company or its personnel.  Any prosecution

pursuant to the terms of this Paragraph relating to the conduct described in the

attached Statement of Facts or relating to conduct known to the Government

15

prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.

16.     In the event the Government determines that the Company has breached this Agreement, the Government agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, including whether the Company believes a breach occurred, whether such breach was material, and whether such breach was knowing and willful.  The Government shall consider such explanation in determining whether to pursue prosecution of the Company.

17.     Notwithstanding anything to the contrary in Paragraph 14, in the event that the Government determines that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company to the Government or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Government against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Government.

18.     The Company acknowledges that the Government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.  The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

### Sale, Merger, or Other Change in Corporate Form of Company

19.     The Company will comply in a timely manner with all of the terms of this Agreement.  If the Company sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement (whether structured as a sale, asset sale, merger, or transfer), unless otherwise agreed to in writing by the Government, the Company will maintain its existence and its ability to fulfill and complete all of its obligations under this Agreement, or include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest to the Company, to fulfill and complete all of the Company's obligations under this Agreement, including an agreement in writing that the Government's ability to determine that there has been a breach under this Agreement is applicable in full force to that entity.

### Public Statements by Company

18

20.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 15-18 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Government.  If the Government determines that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Government shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in

19

part, a statement contained in the attached Statement of Facts. This Paragraph

does not apply to any statement made by any present or former officer, director,

employee, or agent of the Company in the course of any criminal, regulatory, or

civil case initiated against such individual, unless such individual is speaking on

behalf of the Company.

21.     The Government agrees, if requested to do so, to bring to the

attention of law enforcement and regulatory authorities the facts and

circumstances relating to the nature of the conduct underlying this Agreement,

including the nature and quality of the Company's cooperation and remediation.

By agreeing to provide this information to such authorities, the Government is

not agreeing to advocate on behalf of the Company, but rather is agreeing to

provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

22.     This Agreement is binding on the Company and the Government

but specifically does not bind any other component of the Department of Justice,

other federal agencies, or any state, local or foreign law enforcement or

regulatory agencies, or any other authorities, although the Government will

bring the cooperation of the Company and its compliance with its other

obligations under this Agreement to the attention of such agencies and
authorities if requested to do so by the Company.

## Notice

23.     Any notice to the Government under this Agreement shall be given
by personal delivery, overnight delivery by a recognized delivery service, or
registered or certified mail, addressed to:

Chief, Complex Frauds Section
United States Attorney's Office
Northern District of Georgia
75 Ted Turner Dr., SE
Atlanta, GA 30303

Any notice to the Company under this Agreement shall be given by personal
delivery, overnight delivery by a recognized delivery service, or registered or
certified mail, addressed to:

Matthew J. O'Connor
Matthew F. Dunn
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956

Notice shall be effective upon actual receipt by the Government or the Company.

## **Complete Agreement**

24.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Government.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Government, the attorneys for the Company and a duly authorized representative of the Company.

//

//

//

//

//

//

//

//

//

//

FOR THE UNITED STATES OF AMERICA

Byung J. Pak
United States Attorney

9/25/2019

Christopher J. Huber
Assistant United States Attorney
United States Attorney's Office
Northern District of Georgia

FOR AVANIR PHARMACEUTICALS, INC.

_____
Wa'el Hashad
President and Chief Executive Officer
Avanir Pharmaceuticals, Inc.

_____
Matthew J. O'Connor
Matthew F. Dunn
Covington & Burling LLP
Counsel to Avanir Pharmaceuticals, Inc.

24

Attachment A

**Attachment A**

**Statement of Facts**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States of America, by Byung J. Pak, United States Attorney for the Northern District of Georgia (the "Government"), and Defendant Avanir Pharmaceuticals, Inc. (the "Company"). The Company hereby agrees and stipulates that the following information is true and accurate. The Company admits that it is responsible for the acts of its officers, directors, and employees as set forth below. Should the Government pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

1. The defendant, AVANIR PHARMACEUTICALS, INC., was a pharmaceutical company formed under the laws of the state of Delaware, with its principal executive offices at 30 Enterprise, Suite 400, Aliso Viejo, California 92656. It had approximately 500 employees. In January 2015, AVANIR was acquired by Otsuka Holdings Co., Ltd. through its wholly-owned subsidiary, Otsuka Pharmaceutical Co., Ltd.

2. Nuedexta was AVANIR's primary marketed product.

3. The FDA approved Nuedexta for the treatment of pseudobulbar affect ("PBA") in October 2010, and AVANIR commercially launched the drug in

February 2011.  The active ingredients in Nuedexta are Dextromethorphan and Quinidine.  AVANIR has patent exclusivity for the drug until 2026.

4. Nuedexta obtained FDA approval for the treatment of PBA in October 2010. Nuedexta's 2010 FDA-approved label referenced the indication:

> NUEDEXTA is . . . indicated for the treatment of pseudobulbar affect (PBA). Studies to support the effectiveness of NUEDEXTA were performed in patients with underlying amyotrophic lateral sclerosis (ALS) or multiple sclerosis (MS). NUEDEXTA has not been shown to be safe or effective in other types of emotional lability that can commonly occur, for example, in Alzheimer's disease and other dementias.

5. Nuedexta's FDA-approved label was modified in January 2015, as follows: "NUEDEXTA is a combination product containing dextromethorphan hydrobromide (an uncompetitive NMDA receptor antagonist and sigma-1 agonist) and quinidine sulfate (a CYP450 2D6 inhibitor) indicated for the treatment of pseudobulbar affect (PBA)."  PBA is a neurological condition that is characterized by sudden and frequent episodes of involuntary laughing or crying that do not reflect the patient's actual emotional state.  PBA does not exist independently, but occurs secondary to an underlying neurological disorder or injury, such as ALS, MS, Alzheimer's disease, stroke, and traumatic brain injury, as reflected in the FDA-approved label.  PBA has a relatively low level of prevalence among the general population.

6. Executive 1 was at various times Vice President, Sales & Managed Markets, Senior Vice President, Sales, Marketing & Managed Markets, and Senior Vice President, Commercial.

7. Executive 2 was at various times Senior Regional Business Manager, East Area Director, National Sales Director, Neuroscience, Senior Director, Specialty Sales, and Executive Director, National Sales.

8. Executive 3 was at various times Chief Commercial Officer, Chief Operating Officer and Executive Vice-President, and CEO & President.

9. Executive 4 was Vice President, Marketing.

10. Employee 1 was a Nueroscience Area Manager in the Ohio Valley.

11. Employee 2 was at various times Neuroscience Area Manager and Regional Business Manager.

12. Employee 3 was at various times Neuroscience Area Manager and Marketing Product Manager

13. Employee 4 was Regional Business Manager.

14. Employee 5 was at various times Regional Business Manager and an Area Sales Director.

15. Employee 6 was a Senior Neuroscience Area Manager.

16. Employee 7 was a Neuroscience Area Manager.

17. Employee 8 was an Area Sales Director.

18. Employee 9 was a Senior Director, Marketing.

19. Dr. A was a neurologist in Northern Ohio.

3

20.  Medicare and Medicaid were each a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f).

21. The purpose of the scheme was to induce Dr. A to become a high prescriber of Nuedexta to beneficiaries of federal healthcare programs, to offer financial incentives to Dr. A to write additional Nuedexta prescriptions for beneficiaries of federal healthcare programs, and to induce Dr. A to recommend that other physicians prescribe Nuedexta to beneficiaries of federal health care programs.

22. In connection with the kickback scheme, AVANIR paid Dr. A more than $330,000 in speaker fees and honoraria from in or about November 2011 through in or about February 2016.  According to AVANIR's records, Dr. A was the highest prescribing doctor for Nuedexta in the country in total during this period, writing thousands of prescriptions, resulting in over $5 million being paid by Medicare and Medicaid for those prescriptions.

23. As part of the scheme, executives and other employees at AVANIR agreed to use payments to Dr. A, including speaker fees and honoraria, to induce him to maintain and increase his prescription volume.

24. In February 2012, a Neuroscience Area Sales Representative wrote to the wife of a doctor: "I have a way for [the doctor] to make 2500 bucks identify 5 patients from a home that have alzimers or demtia."

25. Sales executives at AVANIR intended for speaker fees to be used to induce prescribers to increase prescriptions of Nuedexta.  For example, in June 2012,

Executive 2, the then East Area Director, wrote an email to sales employees, including one in the Northern District of Georgia, saying:

> I want to give $4K in program money to you 2 help you move both of you even further up the ranking☺
> My initial thought is that you have to feed the F[] machine with it, but I know you have to discuss it first.  Can the two of you talk today and come up with a great way to use this money to get the most return?

26. Employee 3 emailed Employee 2 regarding Dr. A and stated that Dr. A's "script volume has declined" and that a "[s]trategy moving forward is to continue high call frequency, continue speaker program activity, and focus him on a goal of 50 scripts/week" which was a 25% increase from his then-current activity.

27. In or about December 2013, a regional business manager emailed Executive 1 and Executive 2.  In response to that email, Executive 2 stated that the sales representative who worked with Dr. A was "projected to finish the quarter with negative growth."  In order to address that, the regional business manager said "the best way to improve [his] performance would be to increase the scripts from [Dr. A]."  The regional business manager said one method of increasing the scripts was to "Ave [sic] 1 to 2 educational programs per week" for which Dr. A would be paid.

28. In May 2014, a sales manager wrote an email to his sales team saying, "I would like to discuss your individual speakers and how you plan to grow their

business during our Monday one-on-one calls."  Executive 2, then the National

Sales Director, Neuroscience, responded "Great email."

29. In January 2015, AVANIR continued to focus on Dr. A, calling him a

"Hyper Focus Target[]" and sought to increase his prescription level.  A strategy

to accomplish this included continued educational programs occurring one or

two times each week for which Dr. A would be paid.

30. In April 2015, Executive 1 texted an employee about buying alcohol to

provide to Dr. A:

> Executive 1:  If you have room, would you pick up 2 henessey white liquor
> at the airport?  I want to give to customers and maxed out.  Should be
> about $40 per bottle.

31. Also in April 2015, Executive 1 texted with Executive 4 about changes in

the payment for AVANIR speakers and how that would adversely impact the

company's sales goals:

> Executive 1:  Are you ok to discuss speakers and next steps?
> Executive 4:  Yes, I don't have slides. But I thought I could give an update
> on recontracting/Fmv fee structure. And plans/timing for live speaker
> training. And most importantly it's an opportunity to listen to their
> concerns.
> Executive 1:  Ok
> Executive 4:  How did it go with N[] earlier?
> Executive 4:  . . . . we can circle back later on the topic of the speakers
> bureau...  Also, I'm spending a couple of hours later today with J[] and N[]
> to go through all the issues that have surfaced over the past few weeks
> with the speakers bureau to brainstorm solutions and prevent repeat
> occurrences.

Executive 1:  We have a firestorm with the speakers bureau.  If you add the number of speakers who are no longer going to speak and their contribution to our number this year, we will be hard pressed to achieve our goals.  I'm beyond unhappy about this.  By the way, [Dr. A] just opted out.  His words to D[] were "I'm done with you guys."

Executive 1:  I didn't dare tell Dr P[] that he was gone when I saw him this week.  15 homes he now has.

Executive 1:  His last text to me just so you're in the loop....It would be pointless to meet at this time !!! My trust and confidence is down to zero !!! Thank you for your time !!!#

Executive 4:  [Executive 1], I know this has been a rough process. I for one underestimated how some doctors would react to the new fee structure, even when their total compensation under the new contract would not go down. And I certainly didn't expect that a handful of doctors wold have to be removed from the bureau based on their background checks. N[] and I (and J[]) are working to fix the issues with HealthStar (service and technology) and improve the communication around re-contracting and notifying those that are not being offered new contracts.  We spent two hours on this today. Call my cell if you'd like to discuss, otherwise we can address this in person in the office next week. . . .

Executive 1:  Feel that sales has been removed from the process and we are holding the bag to either clean it up with our customers or manage the wrath and lost sales due to co. Decisions.

Executive 1:  I'm not blaming but am spending incredible time managing a ton of upset customers and our team members who are dealing with it. And it's not good enough to say to a customer, call N[].  They, like you and I, consider this a blow off.  Then, when we ask them for help or access, they respond in like fashion.

Executive 4:  If you want, on Monday, I can personally call every single speaker that we are not extending a new contract to and every speaker that is unhappy with our fee structure and let them vent. Reps and managers are taking the heat. I'm willing to jump in for them. In the end there will still be some bruised egos. But we will get past all this, I assure you.

7

Executive 1:  Thanks, but I'm really more interested in finding ways to say yes to some if our current no's vs. having you listen to customers vent. Sales still has to deal with them and still has to find to business that offsets their current volume when they become less enthused about our co.

32. Later that same day, Executive 3 and Executive 1 texted concerning sales' role in managing the speaker program and the negative impact on "big writers" of prescriptions if they are no longer paid through the program:

Executive 3:  Just noticed that K[] was on all those texts - lets keep him off (else there will be another twenty questions). In hindsight we should have moved J[] only after this was all sorted. He and K[] were the drivers here and while N[] is doing a nice job, he inherited something from J[] that he is trying to fix. Think K[] and J[] thought Healthstar was great but maybe not so... Let all meet next week and try and fix collectively.....

Executive 1:  Just very frustrating  for the team to see something rolled out differently than presented and feel that the full team doesn't get the impact of these types of decisions.

Executive 1:  I can manage, but the team is distracted by this and is forced to manage as the face of the co to the customer.

Executive 3:  Fair point and I hear their frustration. Anything I can do to help?

Executive 1:  Next steps lie with E[], N[] to determine what they feel they can do with the feedback.  FYI...there will be repercussions for these big writers that we don't renew.  I hear it's one doc or two but everyone listed accounts for significant amount of biz.

Executive 1:  You can help to ensure that I have a seat at the table to know what is going on vs marketing, medical, compliance making big decisions that sink our ability to achieve goal and leaving sales holding the bag.

Executive 1:  I think D[] has talked him off the ledge. I may have to go to Cleveland Monday to meet with him.

Executive 3:  Were you and E[] able to connect today. Spoke with him about the speaker issues - clearly roll out did not go well. I just reviewed the paperwork on folks being recommended for removal - some pretty bad stuff, some addressable. Think in the end there are 5-6. Lets talk live on it. Believe they are meeting again Monday and suggested you should be in the mtg.  Do you need to go calm [Dr. A] next week.

33. In December 2015, Employee 1 emailed AVANIR's vendor who handled scheduling and paying speakers.  He stated that Dr. A was near the cap for 2015, but that he needed to be added as a speaker multiple times in 2016 and for each speaker program there should be:

No minimum guests.
No food and beverage minimum.
No pre-set menu (ability to order off the menu)
No A/V equipment

34. Also in December 2015, Employee 2 and Employee 1 texted regarding scheduling speaker programs for Dr. A in 2016 in order to keep him prescribing at the levels he did in 2015:

Employee 1:  I've loaded a bunch of programs from Jan –May . . . . Would u recommend me loading more Nuedexta programs into late May, June....

Employee 2:  I would say loading them through May is good!!!  Let's see if our attempt to "force the hands" of those who make our budgets works! Proactively loading these programs is a risk that I (and I am certain you) are willing to take. Best case is that we receive 2015 funding for these programs. Worst case is that they wipe them clean and ask us to judiciously re-enter the programs, within the 2016 budget. Again, this proactive measure of pressing on is the right call. Maybe by doing so, we receive funds that never would have been granted. Time will tell. Now, we wait. Let's see what (if anything) is said.

Employee 1:  Cool. I'll lock and load a few more through the end of mail. And of course there will be the [Dr. A]-add on effect which happens a few times each and every month too. Thanks for the expeditious response.

Employee 2:  It does not look as though we are going to be able to use any of the 2015 funds for 2016.  Even more alarming, in AvanirEvents, I see my Regional budget for 2016 set at $50K.  I am going to send [Employee 5] a text, to see what we can do. If the budget is set at $50K for our entire region, you will have to cancel at least half of the programs submitted. This is part of the reason why I just wanted to schedule programs for January, to test the waters. I will keep you posted.

Employee 2:  I sent a thorough text to [Employee 5]...will keep you posted. We will push it.

Employee 1:  I saw that. I was actually going to text u bc I ran out of funds. Thx [Employee 2]. I definitely appreciate that! I would hate to derail our freight train. I think it's imperative for ur #s and mine too that we keep things moving in a northerly direction.

Employee 2:  I agree and will continue to work at securing additional funds. . . .

35. On Christmas Eve, Employee 2 texted Employee 5 regarding his concerns about the lack of funding to pay doctors, including Dr. A, for speaker programs. He directly linked the need for an increased speaker program budget payments to avoid a decrease in sales in 2016:

10

Employee 2:  Please excuse the Christmas Eve text.  I see in AvanirEvents.com that my 2016 speaker program budget is $50K. This won't even cover Dr. A, let alone give anyone else an opportunity to schedule a program on my team. This was an issue last year as well, at the beginning of the year. This region simply needs more funds. The consequences are dire.  Is my budget actually $50K for 2016? If so, what can we do to secure additional funds? Having experienced the perils of a small budget early on last year, I am certain that we will have an issue on our hands to begin this year as well.  Thanks for looking into this [Employee 5]. I do not want our 2016 sabotaged right out of the gate!
Employee 5:  I think that is just an initial deposit. We are going over to a new vendor in 2016. I haven't received our budget yet
Employee 2:  Very well. Thanks.  Budget allocation was handled poorly last year. All regions were allotted the same amount. Very poor. There is no getting around the "special circumstance" that exists in my Region. One that was created long ago, during launch. It decimated my year in 2015. It stands to do the same for both of us in 2016. I begged, bartered, and borrowed funds early last year in an attempt to mitigate the significant loss. It was a silly exercise to endure. This year, I would like proper allocation, based on business demands and our top priority of hitting 200M in sales!  Thank you, [Employee 5].
Employee 5:  We will have more flexibility this year to allocate
Employee 2:  Excellent. Thank you, [Employee 5].

36. In January, 2016, Employee 2 and Employee 1 continued their discussion about the importance of speaker program funding:

Employee 1:  . . . . On a side note, any updates with respect to 2016 program funding? I would love to keep the machine well oiled but I need more oil;)
Employee 2:  No word from [Employee 5]. I made it very clear to him though, that funding for us needs to be his TOP priority.
Employee 1:  Cool. Thk u. Hopefully u can squeeze some more out of him.

11

Employee 2:  He will give us the majority of his funds. More importantly, he needs to lobby for more funds than the other two directors are set to receive. He knows that the consequences are dire. Time for [Employee 5] to get it done.

Employee 1:  Nice. Yeah, I totally agree [Employee 2]. He needs to deliver!

Employee 2:  I have helped him significantly, with a few things of critical importance. I do believe that we have earned some special consideration.

37. On January 7, 2016, Employee 1 texted Employee 2 about Dr. A:

Employee 1:  A fwd from [Dr. A]. He's hungry, believes in what we are doing and is committed to operation "Shock and Awe." Time to feed the beast [Employee 2].

38. The next day, Employee 1 and Employee 2 continued their conversation via text:

Employee 1:  Talked to [Dr. A]. No shockers. He felt his numbers would be down both weeks bc he worked half days the respective Thursdays and didn't work either Friday...it coincides perfectly with what he was down. He was shocked at [Employee 5]'s numbers. Was wondering if Avanir missed any? He also wanted to stress the importance of continuing programs (in-office and venue based) to me and u . Definitely didn't see that one coming. :) Haha. I told him I agreed and u were working diligently to secure funds...wasn't a matter of if, just when.

Employee 2:  Thanks for the Intel. Is agree, all topics that you provided updates for are both logical and predictable.  Also, tell [Dr. A] that we as in the middle of transitioning out of HealthSTAR and into a new vendor. I mentioned this to him on the phone this past Tuesday, but you might want to reiterate it. That also has something to do with the delay.  Thankfully, we were given some funds to get programs on the books at all...couldn't imagine if you were unable to enter all of those programs for Jan/Feb/March  already.  We will have details soon! And we WILL get it done!

39. Several days later, Employee 1 asked if there were any more information on funding for Dr. A because he has been asking for more:

Employee 1:  Any news on funding? [Dr. A] has been asking about more programs. [Employee 5] got back to me and [Dr. A] today and let us know The healthstar issue has been resolved(i had been using that to bide our time). Can hold him off a little longer, but we're going to need some funding soon [Employee 2].

Employee 2:  Keep holding him off and remind him how I was able to get the funds flowing last year. He needs to constantly be reminded that you and I made it happen.  Do not let him forget that I proactively secured funds all year, making 2015 the most high volume year of programs in Cleveland and the surrounding areas, since launch. . . .  Because I do not see him each week, please always look for opportunities to remind him how hard I work for him, behind the scenes. His knowing this will help you, I guarantee.  If he is aware and confident that things are in motion at a higher level, he responds well. He has a short memory and thus needs a constant reminder. Especially regarding all of the things that I do for him. I say all of this from experience last year.  [Employee 5] expects to have a budget update by next week. Also, D[] and [Employee 5] are flying to Cleveland next Thursday to meet with him. I am working on setting a Greenlight meeting up for him, with K[].

13

Employee 1:  Will do [Employee 2]! I believe he feels a sense of entitlement due to his last two months of performance. He's called me two days in the row, reminding me how important programs are, how imperative it is to continue the momentum, etc. What concerns me is what happened last year, first quarter with B[] when there was a disruption of funding. Hopefully history will not repeat itself. I will do all I can to contain the situation. He's only looking for a few in-office programs. If there's any $ u come across before u hear from [Employee 5], let me know and I will put out the fire by scheduling him three in-office prgms. We can tackle the other prgms later.

* * *

Employee 2:  Amen, brother, on all counts. Trust me, I share in your concern, regarding how last year started off. It ruined my year. I was texting with [Employee 5] last night at 10:30 about funding. He and I have grown quite close  and I do believe that he is going to hook us up with the appropriate funding. I also know that [Dr. A] is relentless and holding him off is not easy.  When I say that my 2016 budget is THE top priority, I mean it, as evidenced by my late night texting with [Employee 5]. The cool thing about [Employee 5] is that he gets it.  When [Dr. A] and I spoke last Tuesday, I told him that my goal was to get K[] to the dinner this Thursday (before or after) so that he could speak with [Dr. A] AND the other docs in attendance. You and I are on the same page.

40. At the same time, Employee 2 was texting with Employee 5 about securing the payments for Dr. A:

Employee 2:  I will and thank you.  Dr. A. is pressing [Employee 1] hard for more programs, inquiring about our 2016 budget multiple times per week. We have expressed to him that our 2016 budget has not been granted quite yet. We have also informed him that Avanir is transitioning to a new vendor. Both of these have bought us some time with Dr. A. [Employee 1] and I plan tactically for Dr. A. weekly, especially during times like these, when an open budget is not available.

14

Employee 5:  Hopefully the new budget will be available soon. I will plan accordingly
Employee 2:  Excellent, [Employee 5]. It will serve all parties well. [Employee 1] and I thank you for that support.


41. Employee 2 and Employee 1 also texted about "funny money" in an effort

to find funds to pay Dr. A:

Employee 2:  Thanks [Employee 1]. I appreciate that initiative.  Also, I asked [Employee 5] to look into whether he is able to "re-allocate the funny money" in HealthSTAR to our Region from another, until the 2016 funds are releases. He said that he would "look into it."  I of course, will stay all over this.
Employee 1:  Great. Thx a lot F[]...appreciate it! Have a great weekend.
Employee 2:  [Employee 1], there might be "funny money" HealthSTAR funds available. When time permits, it is worth checking out. [Employee 5] told me that he started to look into the prospects of moving the "fake funds" around. If they are there, fire away on those 4-5 in-office programs that we had discussed last night!  If funds are not there, know that I will continue to address this issue.  Have an awesome weekend!!!
Employee 1:  Just did. Looks legit. :) I will draft 4 programs and contact B[]/B[] about adding Dr. A as the speaker. Thanks a lot for the back-support. Appreciate it!
Employee 2:  EXCELLENT!  We will effectively be delivering early in the year, just as [Dr. A] had suggested.  I had a strong feeling that [Employee 5] would respond. As mentioned, he is looking for ways to do something for our Region.  A successful Greenlight discussion, followed by this behind the signs securing of funds, sets us up for a massive start to an epic year!
Employee 1:  Exactly! I emailed him that u came through. :) I totally agree. Thx for the persistence.
Employee 2:  Excellent! Way to sell it!  Continue to sell it hard...we came through and always will. Q1 is loaded.
Employee 1:  Absolutely. I'm going to feed him handsomely. Thx brother

15

Employee 2:  You got it. I will feel better once B[] gets it worked out on his end and the programs are active. Either way, this is good news for us. We are  spending heavily early on. Both you and I should  set our course to finish #1 overall in 2016.

Employee 1:  I agree on both accounts. Looking forward to a monstrous run(y)

\* \* \*

Employee 2:  . . . . Also, as you recall, D[] introduced [Employee 5] as a project manager from the 825 team, or something along those lines. So, when reminding [Dr. A] about all the many ways that we come through for him, leave [Employee 5]'s name out entirely. Just keep the focus on you and I. [Employee 5] came through on granting my request for funds, but [Dr. A] just needs to know that I made it happen by getting approval from leadership, etc.  Have an awesome day!

Employee 1:  Great thx. Yeah, I emailed him on Friday but never heard anything back. Yes, I remembered. Absolutely. I told [Dr. A] on Friday that u came through for his first qrt funds request. Thx F[]...u too.

Employee 2:  I figured that you had remembered about [Employee 5]. Concealing [Employee 5]'s real position was D[]'s idea. Keep me posted on [Dr. A]'s response. It might be somewhat tempered, considering the issue with HealthSTAR still remains. Regardless, we got it done!!!

42. In February 2016, Employee 2 texted Dr. A to discuss 2016 performance and speaker payments:

16

Employee 2:  Good morning [Dr. A]! Catching up with you on Friday afternoon was fantastic! We have an unstoppable team in place. If we have a strong finish to Q1, we will be back on track for 2016 PCLUB contention!!!  Let's crush L[], A[], O[], H[] and all of the other territories in 2016! Cleveland WILL be #1!!! I am confident in that!!! We have 20 programs scheduled for Q1, compared to 6 last year in Q1. The plan is in place...now we just need a thunderous performance in February and March to get back into the PCLUB game!!! I will explain ranking methodology tomorrow afternoon. It is ALL about quarter rank, for all four quarters of the calendar year.  I look forward to seeing you tomorrow afternoon, sir. Enjoy your day!

43. A week later, Employee 1 confirmed that Dr. A agreed to continue prescribing and that in return, Employee 1 added speakers programs, with their commensurate fees:

Employee 2:  From Dr. A.:  "Hi [Employee 2]  It was great talking to you !!! Thanks for working on all the well "deserving " options for [Employee 1] !!! He is one very happy guy who always works with his heart !!! I enjoy working with him and recognizing his good relentless efforts makes me feel I am working with the best family of the "greatest people" under one banner called "Avanir" !!! Kudos to the family !!!  DR"
Employee 1:  Wow! Great msg! I believe he's in:D
Employee 2:  Same here! Now, we crush 2016.
Employee 2;  How is [Dr. A] today? Is he fired up and ready to go berserk for us in February and March?
Employee 1:  Don't know. Haven't seen/spoken to him. I'll see him in an hour or two.
Employee 1:  He's fired up and committed. He said he will rx 20 per day from now until the end of the month.
Employee 1:  He's hungry so I'm accommodating an add' prgm for weds and I will sprinkle in a few others. It is a calculated risk, but one worth taking...bet big...win big!!!

17

Employee 2:  Agreed. I trust your judgment. This is why I am always on the hunt, to pillage funds from other regions.

Employee 2:  20 per day....dude.

Employee 2:  THAT is what we need. THAT will deliver the quarter!!!  I can't wait to get back up there with you guys!

Employee 1:  Me too. Even if we have fallout from him, we should be able to right the ship and get things on track. He said he will track his RXs each day! Great news! He's in and all in

Employee 2:  That is perfect. Last week, in its entirety, was mission critical. Your daily pull through and progress check with him will be the difference maker now. Great work, [Employee 1]. We are back on track, with Q1.

Employee 1:  I agree. Thx for the support {Employee 2]. We'll right our ship.

44. Members of AVANIR's sales and marketing management sought to conceal communications from detection, including detection by AVANIR's compliance department.

45. WhatsApp and KIK are third-party messaging applications that purport to have certain levels of encryption.

46. Certain AVANIR sales and marketing executives and employees believed these appilcations provided greater anonymity and used these applications to avoid detection of their communications regarding sales and marketing relating to Nuedexta.

47. For example, in August 2014, Executive 1 and Executive 2 texted each other via WhatsApp:

Executive 1:  [Executive 2], make sure to delete your text messages periodically.  Tell your managers to do the same.

Executive 2:  He said they expect around 1st week of sep, and ok on texts

Executive 2:  Are texts not discoverable if deleted?

48. In June 2015, Executive 1 initiated a WhatsApp group conversation:

Executive 1:  Recommend KIK or what's app for all manager
conversations.  Likely that compliance will start monitoring and auditing
email in near future.
Employee 8:  iMessages are also undiscoverable FYI.

49. Later in September, Executive 3 wrote a group text message to a sales
employee saying:  "M[], moving forward pls no emails on this topic.  Thanks"

50. In early January 2016, Executive 1 wrote to Executive 2 a WhatsApp
message saying:

Pls download KIK.  We will start using instead of What's app.  Since the
directors are using what's app with their teams, would like to migrate to
different user interface for director discussion.

51. Employee 2 and Employee 4 were discussing Dr. A in February 2016, and
commented that it was good that legal and compliance were not at Dr. A's
presentation:

Employee 4:  M[] just text me that [Dr. A] crushed it for her. Did an
amazing job
Employee 2:  Thanks for sharing that, [Employee 4].
Employee 4:  Thankfully no legal or compliance
Employee 4:  Lol

Attachment B

**ACTION**
**BY UNANIMOUS WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS**
**OF AVANIR PHARMACEUTICALS, INC.,**
**a Delaware corporation**
**September 23, 2019**

_____

The undersigned, being all of the members of the board of directors (the "**Board**") of Avanir Pharmaceuticals, Inc., a Delaware corporation (the "**Company**") do hereby consent in writing to the adoption of the following resolutions pursuant to Section 141(f) of the Delaware General Corporation Law (the "**DGCL**") and Section 3.8 of the Amended and Restated Bylaws of Avanir Pharmaceuticals, Inc., effective January 13, 2015, such action to have the same force and effect as a unanimous vote of the directors of the Company at a meeting duly called and held:

**Investigation Resolution**

WHEREAS, the federal government has been conducting an investigation into the Company's sales and marketing practices from October 29, 2010 through December 31, 2016 overseen by the Civil Division of the Department of Justice and the United States Attorney's Offices for the Northern District of Georgia and the Northern District of Ohio ("**Investigation**");

WHEREAS, the Board has consulted with legal counsel in connection with the Investigation;

WHEREAS, the Company's legal counsel has been negotiating a resolution of the Investigation;

WHEREAS, the Company's legal counsel has reported to the Board the terms and conditions of a proposed resolution of the Investigation;

WHEREAS, the Board has reviewed and been advised by counsel with respect to the proposed Information, Deferred Prosecution Agreement, and Statement of Facts related to the Investigation (collectively, the "**Deferred Prosecution Agreement**");

WHEREAS, the Board has reviewed and been advised by counsel with respect to the contents of the proposed civil Federal Settlement Agreement and civil State Settlement Agreements related to the Investigation (collectively, the "**Civil Settlement Agreements**");

WHEREAS, the Board has reviewed and been advised by counsel with respect to the contents of the proposed Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services ("**HHS/OIG**") related to the Investigation ("**CIA**");

NOW, THEREFORE, in consideration of the premises and such other facts and circumstances as determined relevant or otherwise appropriate to consider in acting on the matter, be it:

RESOLVED, that the Company is hereby authorized and directed to enter into the Deferred Prosecution Agreement, Civil Settlement Agreements, and CIA;

FURTHER RESOLVED, that officers of the Company, or their duly authorized representatives or attorneys, including the Company's legal counsel Covington & Burling LLP, are hereby authorized and directed to take all actions and deliver any agreements, certificates and documents and instruments with respect to or contemplated by the matters set forth above, including, without limitation, the payment of all amounts, fees, costs and other expenses, necessary or appropriate to effectuate the purpose and intent of the foregoing resolutions and to effectuate and implement the resolutions contemplated hereby, including, if necessary, appearing in court and being sworn as an authorized representative of the Company to address the Deferred Prosecution Agreement and fulfill any requirements necessary to satisfy the terms of that agreement, including, but not limited to, the initial appearance and entry of a plea on behalf of the Company; and

FURTHER RESOLVED, that any actions taken by the officers of the Company, or their duly authorized representatives or attorneys, prior to the adoption of this resolution, that are within the authority conferred hereby, are fully ratified, confirmed and approved as the acts and deeds of the Company.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the undersigned, constituting all of the members of the Board, have caused this unanimous written consent to be executed as of the day, month and year first written above. This action by unanimous written consent may be signed in counterparts, including counterparts transmitted by facsimile or other electronic transmission, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board.

_____
Don Hayden

_____
Kabir Nath

_____
Wa'el Hashad

_____
William Carson, M.D.

_____
Thomas DesRosier

_____
Robert McQuade

IN WITNESS WHEREOF, the undersigned, constituting all of the members of the Board, have caused this unanimous written consent to be executed as of the day, month and year first written above. This action by unanimous written consent may be signed in counterparts, including counterparts transmitted by facsimile or other electronic transmission, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board.

 

_____
Don Hayden

_____
Kabir Nath

 

_____
Wa'el Hashad

 

_____
William Carson, M.D.

 

_____
Thomas DesRosier

 

_____
Robert McQuade

IN WITNESS WHEREOF, the undersigned, constituting all of the members of the Board, have caused this unanimous written consent to be executed as of the day, month and year first written above. This action by unanimous written consent may be signed in counterparts, including counterparts transmitted by facsimile or other electronic transmission, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board.

_____
Don Hayden

_____
Kabir Nath

_____
Wa'el Hashad

_____
William Carson, M.D.

_____
Thomas DesRosier

_____
Robert McQuade

IN WITNESS WHEREOF, the undersigned, constituting all of the members of the Board, have caused this unanimous written consent to be executed as of the day, month and year first written above. This action by unanimous written consent may be signed in counterparts, including counterparts transmitted by facsimile or other electronic transmission, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board.

_____

Don Hayden

_____

Kabir Nath

_____

Wa'el Hashad

_____

William Carson, M.D.

_____

Thomas DesRosier

_____

Robert McQuade

IN WITNESS WHEREOF, the undersigned, constituting all of the members of the Board, have caused this unanimous written consent to be executed as of the day, month and year first written above. This action by unanimous written consent may be signed in counterparts, including counterparts transmitted by facsimile or other electronic transmission, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board.

_____
Don Hayden


_____
Kabir Nath


_____
Wa'el Hashad


_____
William Carson, M.D.


_____
Thomas DesRosier


_____
Robert McQuade

IN WITNESS WHEREOF, the undersigned, constituting all of the members of the Board, have caused this unanimous written consent to be executed as of the day, month and year first written above. This action by unanimous written consent may be signed in counterparts, including counterparts transmitted by facsimile or other electronic transmission, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board.

 

_____

Don Hayden

 

_____

Kabir Nath

 

_____

Wa'el Hashad

 

_____

William Carson, M.D.

 

_____

Thomas DesRosier

 

_____

Robert McQuade

# Addendum to the Deferred Prosecution Agreement

Addendum to the Deferred Prosecution Agreement between the United States Attorney for the Northern District of Georgia and Avanir Pharmaceuticals, Inc.

The United States of America, by Justin E. Herdman, United States Attorney for the Northern District of Ohio, (1) is aware of facts and circumstances covered by the Deferred Prosecution Agreement (DPA) between the United States Attorney for the Northern District of Georgia and Avanir Pharmaceuticals, Inc. and set forth in the statement of facts attached to the DPA; and (2) recognizes that venue for the allegations contained in the related criminal Information could be found to rest in the Northern District of Ohio.

Notwithstanding these facts, the Northern District of Ohio agrees that it shall not seek to prosecute or bring any criminal case against Avanir Pharmaceuticals, Inc., its subsidiaries, operationally controlled affiliates, successors, or assigns for any act within the scope of, or relating to: (1) the conduct covered by this Agreement, the Information, and the attached Statement of Facts; (2) the conduct that was the subject of the subpoena to Avanir Pharmaceuticals, Inc. dated February 19, 2016, and the related criminal investigation and civil investigation by components of the United States Department of Justice, including the Northern District of Georgia and Northern District of Ohio; or (3) facts currently known to the Northern District of Georgia and Northern District of Ohio regarding sales, promotion, and marketing practices in connection with the drug Nuedexta at the time of entry of the DPA.

This agreement does not affect Avanir Pharmaceuticals, Inc.'s obligations to comply with the DPA as it relates to the prosecution of individuals in United States. v. Raheja, et al., case no _____, including its agreement to cooperate with the government, including the Northern District of Ohio.

1

FOR THE UNITED STATES OF AMERICA

9/20/2019

Justin E. Herdman
United States Attorney
Northern District of Ohio

FOR AVANIR PHARMACEUTICALS, INC.

9/25/19

Matthew J. O'Connor
Matthew F. Dunn
Covington & Burling, LLP
Counsel to Avanir Pharmaceuticals, Inc.

2